**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JOANN D. CLOBRIDGE,**

                                        **Plaintiff,**

        **vs.**                                                **5:07-CV-00691**
                                                               **(NAM)**

**MICHAEL J. ASTRUE,**
**COMMISSIONER OF SOCIAL SECURITY,**

                                        **Defendant.**
_____

**APPEARANCES:**                        **OF COUNSEL:**

OLINSKY & SHURTLIFF                    Jaya Shurtliff, Esq.
300 S. State Street
Suite 520
Syracuse, New York 13202
_Attorneys for Plaintiff_

RICHARD HARTUNIAN                      Maria Fragassi Santangelo, Esq.
United States Attorney                 Special Assistant U.S. Attorney
Northern District of New York
P.O. Box 7198
100 South Clinton Street
Syracuse, New York 13261-7198

Office of the General Counsel, Region II
Social Security Administration
26 Federal Plaza, Room 3904
New York, New York 10278
_Attorney for Defendant_

**Norman A. Mordue, Chief U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

**I.      INTRODUCTION**

        Plaintiff Joann Clobridge brings the above-captioned action pursuant to 42 U.S.C. §

405(g) of the Social Security Act, seeking a review of the Commissioner of Social Security's

decision to deny her application for disability benefits.

## II.    BACKGROUND

On June 7, 2005, plaintiff protectively filed an application for Disability Insurance Benefits ("DIB").  (T. 65)[1].  Plaintiff was 47 years old at the time of her application and alleged an inability to work due to neck surgery on March 3, 1997 and continued neck, left arm and left hand pain.  (T. 76).  Plaintiff completed two years of college and received an Associates Degree.  (T. 27).  Plaintiff's past work consisted of employment as a bank teller, bookkeeper, cashier and data entry/secretarial work.  (T. 26).

On September 6, 2005, plaintiff's application was denied and plaintiff requested a hearing by an ALJ which was held on January 3, 2007.  (T. 20, 45).   On February 20, 2007, the ALJ issued a decision denying plaintiff's claim for disability benefits.  (T. 11-18).  The Appeals Council denied plaintiff's request for review on April 27, 2007, making the ALJ's decision the final determination of the Commissioner. (T. 3).  This action followed.

## III.    DISCUSSION

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to individuals with "disabilities."  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  There is a five-step analysis for evaluating disability claims:

"In essence, if the Commissioner determines (1) that the claimant is not working, (2)

---

[1]  "(T. )" refers to pages of the administrative transcript, Dkt. No. 9.

that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal citations omitted).

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw*, 221 F.3d at 131. Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

On February 20, 2007, the ALJ issued a decision noting that the relevant period was March 1, 1997, the alleged onset date, through September 30, 1998, the date last insured.[2] (T. 13). The ALJ found at step one that plaintiff has not engaged in substantial gainful activity since March 1, 1997. (T. 13). At step two, the ALJ concluded that plaintiff suffered from status post cervical discectomy and fusion which qualified as "severe impairments" within the meaning of the Social Security Regulations (the "Regulations"). (T. 13). At the third step of the analysis, the ALJ determined that plaintiff's impairments did not meet or equal the severity of any impairment listed in Appendix 1 of the Regulations. (T. 15). The ALJ found that plaintiff had the residual functional capacity ("RFC") to "lift/carry 20 pounds occasionally and 10 pounds frequently, sit

---

[2] The parties do not dispute this conclusion.

for 6 hours in an 8 hour workday, stand/walk for 6 hours in an 8 hour workday, could occasionally engage in postural activities and could not engage in repetitive pushing and pulling with her upper extremities."  (T. 15).  Therefore, at step four, the ALJ concluded that plaintiff was unable to perform all of her past relevant work. (T. 16).  Relying on the medical-vocational guidelines ("the grids") set forth in the Social Security Regulations, 20 C.F.R. Pt. 404, Subpt. P, App. 2, the ALJ found that plaintiff has the exertional capacity to perform a full range of light work.  (T. 17).  Therefore, the ALJ concluded that plaintiff was not under a disability as defined by the Social Security Act.  (T. 17).

In seeking federal judicial review of the Commissioner's decision, plaintiff argues that: (1) plaintiff's neck impairment meets the requirements of Listing § 1.04A; (2) the ALJ failed to develop the record and follow the treating physician rule; (3) the ALJ's credibility assessment did not comply with §404.1529; (4) the RFC determination by the ALJ is not supported by substantial evidence; and (5) plaintiff presents non-exertional impairments which require the use of a vocational rehabilitation expert rather than reliance upon the grids and thus, the Commissioner did not sustain his burden of proof at the fifth step of the sequential evaluation process. (Dkt. No. 16).

### A.    Meet or Medically Equals a Listed Impairment - Listing § 1.04A

Plaintiff claims that she suffers from an impairment that meets the level described in Listing § 1.04A.  Plaintiff contends that the Commissioner's decision should be vacated and the matter remanded to the agency for the sole purpose of calculation of benefits. (Dkt. No. 16, p. 20).  The Commissioner argues that the ALJ's decision on the issue is supported by substantial evidence.  (Dkt. No. 18, p. 11).  Defendant contends that the evidence does not depict a condition

of Listing-level severity lasting for 12 continuous months during the insured period.

A claimant is automatically entitled to benefits if her impairment(s) meets the criteria set forth in Appendix 1 to Subpart P of Part 404. *McKinney v. Astrue*, 2008 WL 312758, *4 (N.D.N.Y. 2008). The burden is on the plaintiff to present medical findings which show that her impairments match a listing or are equal in severity to a listed impairment. *Zwick v. Apfel*, 1998 WL 426800, at *6 (S.D.N.Y. 1998). In order to show that an impairment matches a listing, the claimant must show that her impairment meets all of the specified medical criteria. *Pratt v. Astrue*, 2008 WL 2594430, at *6 (N.D.N.Y. 2008) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)) (holding that if a claimant's impairment "manifests only some of those criteria, no matter how severely," such impairment does not qualify). Evidence of an impairment that reached disabling severity after the expiration of an individual's insured status cannot be the basis for a disability determination, even though the impairment itself may have existed before the individual's insured status expired. *Mattison v. Astrue*, 2009 WL 3839398, at *5 (N.D.N.Y. 2009) (citations omitted). However, evidence of a disability attained after a plaintiff's insured period may be pertinent "in that it may disclose the severity and continuity of impairments existing before" the insured period expired. *Gold v. Sec'y of Health, Educ. & Welfare*, 463 F.2d 38, 41-42 (2d Cir.1972).

The requirements of disability for spine disorders listed in 20 C.F.R. Part 404, Subpt. P, App. 1, state:

> 1.04    Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A.    Evidence of nerve root compression characterized by

5

> neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

*Horohoe v. Astrue*, 2009 WL 2156915, at *9 (N.D.N.Y. 2009). The plaintiff's treating source or other health care provider records must demonstrate that plaintiff suffered from nerve root compression and each of the four characteristics required by the Listing for the relevant time period. *See Sullivan*, 493 U.S. at 530.

Here, treatment records for the insured period reveal as follows: In February 1997, plaintiff was treated by Richard Zogby, M.D., an orthopedic surgeon for complaints of neck, upper arm and shoulder pain. Dr. Zogby ordered an MRI to rule out the cervical spine as the source of her shoulder and elbow pain. (T. 152). According to Dr. Zogby's records, the MRI "reveals several abnormalities and fairly significant at C4-5". Dr. Zogby further noted, "there is a central disc herniation which appears fairly acute . . [a]t C5-6 and C6-7 there are more right than left sided impingement[] of the spinal cord but there is at least moderate central canal stenosis with impingement".[3] (T. 152). In March 1997, Dr. Zogby performed a cervical discectomy and fusion at Crouse Hospital. In the operative report, Dr. Zogby noted that plaintiff, "had a central herniated disk at C4-5 impinging the thecal sac and spinal cord". (T. 100). Plaintiff's discharge diagnosis was cervical radiculopathy and herniated cervical disc.[4] (T. 95).

After surgery, plaintiff had approximately eleven follow up visits with Dr. Zogby. (T.

---

[3] The actual MRI report including the date and location of the testing is not included in the record. Dr. Zogby commented on the results during plaintiff's examination in February 1997.

[4] Radiculopathy is a disease of the nerve roots. *Dorland's Illustrated Medical Dictionary*, 1595 (31st ed. 2007).

136-149).  In April 1997, Dr. Zogby noted that plaintiff's neck pain was decreasing and her upper and lower extremity strength was improving. (T. 148).  In May 1997, Dr. Zogby noted that plaintiff had "improving radiculopathy" and her sensory examination was "normal". (T. 147). In July 1997, plaintiff admitted that she had more motion in her neck and upon examination, Dr. Zogby noted, "ROM of her neck is improved" and plaintiff exhibited "5/5 strength with upper extremities and 4/5 strength in her shoulder". (T. 143).  In November 1997, plaintiff admitted that her pain was much better and that her arm strength was improving.  (T. 140).  Dr. Zogby opined that, "things are improving, as I expected".  (T. 140).  In February and March 1998, Dr. Zogby noted plaintiff was neurologically stable and "near 5/5 strength". (T. 138).  On May 21, 1998, plaintiff complained of discomfort in her shoulder but made no complaints regarding her neck. (T. 136).  Plaintiff did not seek further treatment with Dr. Zogby until December 7, 2001.

On September 14, 1998, plaintiff was examined by Dr. Ami Milton, a specialist in internal medicine and rheumatology, at Dr. Zogby's request. (T. 134).  Dr. Milton noted that plaintiff exhibited moderate decreased range of motion in her cervical spine without pain or radicular symptoms, plaintiff's grip, strength and range of motion in her extremities were "good" and essentially "normal". (T. 135).  Dr. Milton diagnosed plaintiff with generalized arthritis and prescribed Tylenol and a sleep aid.  (T. 135).

In the decision, the ALJ stated:

> The claimant does not have an impairment or combination of impairments that meet or medically equal the severity of any impairment in Sections 1.02, 1.04 or 11.14 of the Listings. (T. 14).

The ALJ noted that claimant "did well after surgery" and continually reported to Dr. Zogby that she had less pain in her arm and neck.  The ALJ cited to Dr. Zogby's office notes in

April 1997, May 1997 and July 1997 which revealed that plaintiff had full rotator cuff strength, improved arm strength, normal sensation and better ranges of motion in her neck. (T. 13-14). The ALJ also cited to Dr. Zogby's May 1998 notes wherein he stated that plaintiff was "neurologically intact". (T. 14).

Plaintiff argues that the MRI films provide evidence of compression on the nerve root. The Court agrees. In the decision, the ALJ failed to acknowledge the MRI report and although he mentioned plaintiff's surgery, he failed to address the operative report or discharge diagnosis. The records from Dr. Zogby and Crouse Hospital indicate that plaintiff suffered from a spinal cord disease with nerve root compression. Thus, substantial evidence supports plaintiff's argument that she satisfied the first prong of Listing 1.04A. However, the Court cannot end the inquiry there.

In order to show that an impairment meets the requirements of a listing, plaintiff must demonstrate that her impairment meets all of the specified medical criteria. *Sullivan*, 493 U.S. at 530. Plaintiff claims that she made constant complaints of pain to her treating physicians, suffered from weakness and sensory decreases in the months after surgery, and suffered from marked limitations in her range of motion and muscle weakness in her upper extremities with atrophy. (Dkt. No. 16, p. 20). The only treatment plaintiff received during the relevant time period was from Dr. Zogby. Dr. Zogby's records from 1997 through 1998 do not provide any evidence of any neuro-anatomic distribution of pain, limitation of motion or motor loss accompanied by sensory or reflex loss as required under Listing 1.04(A). Indeed, Dr. Zogby continually noted that plaintiff's pain had subsided and that her range of motion and strength improved and Dr. Zogby made no reference of any atrophy or sensory/reflex loss.

Plaintiff claims that her treatment records from 2003 through 2005 provide evidence of the remaining criteria of 1.04A.  (Dkt. No. 16, p. 20).  Upon review of the record, the Court finds plaintiff's reliance upon records that post-date the insured period misplaced.  In July 2001, plaintiff began treating with Carol Valentino, M.D. a physician at Family Medicine Associations.  (T. 225).  Dr. Valentino treated plaintiff for a host of complaints including anemia, depression and chronic pain. (T. 221).  However, Dr. Valentino did not provide any opinion with regard to plaintiff's neck or shoulder pain and her treatment records lack any objective findings or details of any clinical examinations of plaintiff's neck or cervical spine.  Dr. Valentino's records lack any opinion or reference to plaintiff's impairments during the insured period.

In September 2001, plaintiff began treating at Upstate Pain Treatment Center. (T. 202).  During the initial visit, Parag Pandya, M.D., examined plaintiff and noted that plaintiff exhibited no motor or sensory deficits, normal reflexes and a normal range of motion.  (T. 204).  Plaintiff was diagnosed with left occipital neuralgia, myofascial pain syndrome and chronic neck pain.[5] (T. 175, 204).  Plaintiff received treatment at the Pain Treatment Center until July 2005.  During that time, she was prescribed various medications including Neurontin and Vioxx and   received occipital nerve blocks and trigger point injections.[6]  (T. 159-200).   Plaintiff reported that the injections provided "good pain relief". (T. 171).  The records lack any objective evidence, clinical findings or opinions with regard to plaintiff's impairments during the insured period.

In December 2001, plaintiff returned to Dr. Zogby complaining of neck pain as a result of

---

[5] Occipital Neuralgia is pain extending along the course of the upper cervical nerves, especially the posterior division of the second cervical nerve.  *Id.* at 1281.  Myofascial Pain is caused by inflammation of the muscles.  *Id.* at 1241.

[6] Neurontin is an anticonvulsant used as adjunctive therapy in the treatment of partial seizures.  *Id.* at 764, 1287.  Vioxx is a non-steroidal antiinflammatory drug used to treat acute pain. *Id.* at 1677, 2086.

a motor vehicle accident. (T. 132).  Dr. Zogby diagnosed plaintiff with cervical radiculopathy. (T. 132).  On March 1, 2002, plaintiff complained of neck and arm pain and advised that her pain was managed at a pain clinic. (T. 130).  Upon examination, Dr. Zogby noted that her range of motion in her left trapezius was limited but that her motor and sensory examinations of her upper extremities were normal. (T. 130).  Plaintiff returned a year and a half later, on September 24, 2003, complaining of cervical pain and pain in both shoulders. (T. 126).  Dr. Zogby noted plaintiff was in "slight pain" with marked limitation of motion in all directions. (T. 127).  Plaintiff's reflex, sensory and motor examinations were normal. (T. 128).  Dr. Zogby diagnosed plaintiff with cervical radiculitis and recommended physical therapy. (T. 128).  Plaintiff returned to Dr. Zogby for six more visits through August 2004.  During that time, Dr. Zogby's clinical findings were largely unchanged. (T. 105 - 124).  However, Dr. Zogby also diagnosed plaintiff with shoulder tendinitis and noted that much of plaintiff's pain involved the shoulder and subacromial region with, "neck symptoms improving" as plaintiff "appears neurologically stable". (T. 118, 123).

On August 24, 2004, at Dr. Valentino's request, plaintiff was examined by Gerard S. Rodziewicz, M.D., a neurosurgeon. (T. 155).  Dr. Rodziewicz examined plaintiff and found, "motor is 5/5" in her upper extremities, reflexes were 2+ and equal bilaterally and noted that plaintiff could flex, extend and rotate to the right or left with mild pain. (T. 156).  The remainder of the examination was normal. (T. 156).  Dr. Rodziewicz recommended nonsurgical management. (T. 156).  On November 3, 2005, plaintiff was examined by Dr. Craig Montgomery, a neurosurgeon.  (T. 244).  Upon examination, Dr. Montgomery concluded plaintiff exhibited cervical myelopathy, atrophy in her hands and weakness in her upper extremities.  (T. 245).  Dr.

Montgomery found "chronic changes" with evidence of spinal cord injury and long standing nerve damage and suggested aggressive pain management.  Plaintiff did not seek or receive any follow up treatment from Drs. Rodziewicz or Montgomery.

Although there is evidence of compromise of a nerve root and/or the spinal cord, substantial evidence does not support plaintiff's claim that she suffered from the remaining necessary criteria.  The medical records for treatment rendered after the insured period do not provide any evidence of neuro-anatomic pain, limitation of motion or motor loss accompanied by sensory or reflex loss at **any time**, including the insured period. *See Greiman v. Astrue*, 2007 WL 3231531, at *5 (W.D.Va. 2007) (the medical record fails to demonstrate that plaintiff's cervical impairment manifests all of Listing 1.04A's exacting requirements prior to the expiration of her insured status).  The physicians failed to provide an opinion or even mention plaintiff's treatment or impairments during the insured period.  There is no indication that the physicians reviewed any of plaintiff's prior medical records or reports from the insured period.  Dr. Valentino's diagnosis of "chronic pain" fails to satisfy the criteria of Listing 1.04.  The requirements of Listing 1.04(A) are worded so as to require the combination of all symptoms as well as evidence of a compromised nerve root or spinal cord. The evidence fails to establish these listing requirements. *Mattison*, 2009 WL 3839398, at *4-6.  Thus, the ALJ's decision is supported by substantial evidence and plaintiff's motion for remand for a calculation of benefits is denied.  Accordingly, the Court will examine plaintiff's additional arguments and request for remand for additional proceedings.

**B.      Duty to Develop Record and Treating Physician Rule**

Plaintiff argues that the ALJ failed to develop the record and assign the proper weight to

the opinions of plaintiff's treating physicians. Specifically, plaintiff alleges that the ALJ's decision not to seek a function-by-function opinion from any of plaintiff's treating sources, retrospective or current was clear error.  (Dkt. No. 16, p. 22).   The Commissioner contends that the record was replete with treatment notes from Dr. Zogby and thus, sufficiently developed for the ALJ to make a disability determination.  (Dkt. No. 18, p. 16).

Under the Regulations, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d)(2); *see also Rosa*, 168 F.3d at 78-79; *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).  An ALJ may refuse to consider the treating physician's opinion controlling only if he is able to set forth good reason for doing so.  *Barnett v. Apfel*, 13 F.Supp.2d 312, 316 (N.D.N.Y. 1998).  "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand."  *Peralta v. Barnhart*, 2005 WL 1527669, at *10 (E.D.N.Y. 2005) (remanding case where the ALJ failed to explain the weight, if any, assigned to the treating physician's opinions) (citing *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)).  The opinion of a treating physician is not afforded controlling weight where the treating physician's opinion contradicts other substantial evidence in the record, such as the opinions of other medical experts. *Williams v. Comm'r of Soc. Sec.*, 236 F.App'x 641, 643-44 (2d Cir. 2007); *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (citing 20 C.F.R. § 404.1527(d)(2)).  The less consistent an opinion is with the record as a whole, the less weight it is to be given.  *Stevens v. Barnhart*, 473 F.Supp.2d 357, 362 (N.D.N.Y. 2007); *see also Otts v. Comm'r of Soc. Sec.*, 249 F.App'x 887, 889 (2d Cir. 2007) (an ALJ may reject such an opinion of a treating physician "upon the identification of good reasons, such as substantial contradictory evidence in the record").

When an ALJ refuses to assign a treating physician's opinion controlling weight, he must consider a number of factors to determine the appropriate weight to assign, including:

> (I) the frequency of the examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

20 C.F.R. § 404.1527(d)(2).

A treating physician's belief that a plaintiff is "totally disabled" is irrelevant since that determination is reserved for the Commissioner. *Taylor v. Barnhart*, 83 F.App'x 347, 349 (2d Cir. 2003); *Gladden v. Comm'r of Soc. Sec.*, 337 F.App'x 136, 138 (2d Cir. 2009). While the final responsibility for deciding issues relating to disability is reserved to the Commissioner, the ALJ must still give controlling weight to a treating physician's opinion on the nature and severity of a plaintiff's impairment when the opinion is not inconsistent with substantial evidence. *See Martin v. Astrue*, 337 F.App'x 87, 89 (2d Cir. 2009).

The ALJ has a "particularly important" duty to develop the record when obtaining information from a claimant's treating physician due to the "treating physician" provisions in the regulations. *Devora v. Barnhart*, 205 F.Supp.2d 164, 172 (S.D.N.Y. 2002). "There is ample case law suggesting that an ALJ has an independent duty to make reasonable efforts to obtain a report prepared by a claimant's treating physician in order to afford the claimant a full and fair hearing." *Devora*, 205 F. Supp.2d at 174 (collecting cases). This obligation includes obtaining the treating physicians' assessments of plaintiff's functional capacity. 20 C.F.R. § 404.1512(e); *see also Hardhardt v. Astrue*, 2008 WL 2244995, at *9 (E.D.N.Y. 2008). Remand is necessary if the ALJ fails to attempt to contact the plaintiff's treating physician to properly determine her RFC. *See*

*Rosa v. Apfel,* 1998 WL 437172, at *4 (S.D.N.Y. 1998); *see also Hopper v. Comm'r of Soc. Sec.,* 2008 WL 724228, at *11 (N.D.N.Y. 2008); *see also Oliveras ex rel. Gonzalez v. Astrue,* 2008 WL 2262618, at *6-7 (S.D.N.Y. 2008) (holding that remand is appropriate even where there is no guarantee that the outcome will change, so that the ALJ can make reasonable efforts to obtain the treating physicians opinion on functional capacity).

In cases where there are no contemporaneous treatment records, the ALJ should consider the possibility of retrospective diagnosis and testing. *Rose v. Barnhart*, 2003 WL 1212866, at *5 (S.D.N.Y. 2003) (the absence of contemporaneous medical evidence does not automatically preclude a finding of disability ). "A treating physician's retrospective medical assessment of a patient may be probative when based upon clinically acceptable diagnostic techniques." *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir.1996). Indeed, a treating physician's retrospective opinion is entitled to controlling weight unless it is contradicted by other medical evidence or "overwhelmingly compelling" non-medical evidence. *Rivera v. Sullivan*, 923 F.2d 964, 968-69 (2d Cir. 1991); *Wagner v. Sec'y of Health & Human Servs*., 906 F.2d 856, 862 (2d Cir.1991).

As previously discussed, the insured period was March 1, 1997 through September 30, 1998. For the relevant period, the only medical evidence contained in the record are Crouse Hospital's reports of plaintiff's surgery, treatment records from Dr. Zogby from 1996 until May 1998, physical therapy records and one report from Dr. Milton, M.D.[7]  On June 26, 1997, July 30, 1997 and September 14, 1997, Dr. Zogby completed a form entitled Attending Physician's Statement Return To Work Medical Clearance. (T. 141, 144, 146). On the July 1997 and September 1997 forms, Dr. Zogby indicated that plaintiff was "totally disabled". On the

---

[7]  From July 7, 1997 until July 16, 1997, plaintiff received physical therapy at Riccelli Physical Therapy for left arm and cervical pain. (T. 103).

14

September 1997 form, Dr. Zogby opined that plaintiff could continue to increase her activities. (T. 141).

The Administrative Transcript does not contain any assessments from any of plaintiff's treating sources or consultative physicians regarding how plaintiff's impairments affect her ability to perform work-related activities **for any period of time**.  The only assessment of plaintiff's ability to do work related activities is a Physical Residual Functional Capacity Assessment prepared by a disability analyst on August 30, 2005 - approximately 7 years after the period for which plaintiff is seeking benefits. (T. 240).

In the decision, the ALJ acknowledged Dr. Zogby's opinions regarding plaintiff's ability to work and his assessment that she was "totally disabled". (T. 16).  However, the ALJ assigned "little weight" to Dr. Zogby's statement concluding that:

> First, they are not detailed function by function assessments but are general statements on the ultimate issue of disability and such statements do not satisfy Security [sic] Security disability policy. Second, [] the medical evidence of record fails to support Dr. Zogby's opinion . . . Third, the claimant's own representations indicate that she was able to perform various activities of daily living, which is contrary to Dr. Zogby's opinion that the claimant is totally disabled.  (T. 16).

The ALJ acknowledged plaintiff's treatment with Dr. Milton but failed to assign any weight to Dr. Milton's opinions noting that Dr. Milton treated plaintiff on "one occasion" for an evaluation. (T. 14).

Based upon the sparse medical record, the ALJ's decision is not supported by substantial evidence.  In this case, the ALJ had an affirmative duty, even if plaintiff was represented by counsel, to develop the medical record and request that Dr. Zogby provide a retrospective assessment of plaintiff's functional capacity for the insured period.  The ALJ's failure to seek a

function-by-function analysis from Dr. Zogby left gaps in the record and was clear error.  Plaintiff argues that, "despite the existence of numerous treating sources, the ALJ did not attempt to obtain a function-by-function opinion from any one of them".  For the insured period, Dr. Zogby was the only physician who had an ongoing treating relationship with plaintiff. *See Fernandez v. Apfel*, 1998 WL 812591, at *3 (E.D.N.Y. 1998) (citing 20 C.F.R.§ 404.1502) (a treating source is defined as a plaintiff's own physician who has provided plaintiff with medical treatment or evaluation and who has had an ongoing treatment relationship with the plaintiff").  The ALJ's obligation to develop the record does not encompass plaintiff's medical providers from 2001 through 2005.  For this period, the record contains treatment records from Dr. Zogby, Dr. Valentino, treatment records from various physicians at the Upstate Pain Treatment Center, and consultative reports from Drs. Rodziewicz and Montgomery.  The ALJ was not required to seek a retrospective opinion from any of the aforementioned physicians because they did not treat plaintiff during the insured period.  *See Monette v. Astrue*, 269 F. App'x 109, 112 (2d Cir. 2008) (citing *Arnone v. Bowen*, 882 F.2d 34, 41 (2d Cir.1989) (finding that where the claimant's claim depended on showing continuous disability from 1977-1980, a doctor who treated him in 1987, was not a "treating physician" within the meaning of the rule, because "there simply was no ongoing physician-treatment relationship between" the claimant and the doctor during the relevant period and the doctor was therefore "not in a unique position to make a complete and accurate diagnosis") (internal quotations and citations omitted)).  Accordingly, the ALJ's duty to seek a retrospective opinion extended only to Dr. Zogby.  Although Dr. Milton provided a report and opinion, Dr. Milton only examined plaintiff once and therefore, the ALJ was not required to give controlling weight to Dr. Milton's opinion and was not obligated to seek a retrospective

opinion. *See Brown v. Apfel*, 1998 WL 767140, at *5 (E.D.N.Y. 1998) (under the regulations, hospital records, therapist records and the records of a consulting physician are to be viewed by an ALJ as warranting less weight than is the opinion of a treating physician).

Because the ALJ failed to adequately develop the record and obtain a functional analysis from Dr. Zogby, the Court is constrained to conclude that the ALJ properly applied the treating physician rule.  Due to an incomplete record, the Court cannot find that Dr. Zogby's opinion was inconsistent with other evidence in the record and thus, the Court is unable to conclude that the weight afforded to Dr. Zogby's opinion is supported by substantial evidence.

Finally, the Court notes that plaintiff also claims that the ALJ failed to obtain all the treating and examining source records including records from Drs. Hosapple and Yonemura.  This argument lacks merit.  First, plaintiff has not provided any evidence with regard to when or what type of treatment Drs. Hosapple and/or Yonemura provided and did not include these doctors in her list of medical sources. (T. 78-79).  Accordingly, there is no evidence that Drs. Hosapple or Yonemura were treating physicians during the insured period.  *Cf. Devora v. Barnhart*, 205 F.Supp.2d 164, 174 (S.D.N.Y. 2002) (the ALJ has a duty to develop the record and seek clarification from a treating physician).  Further, during the Administrative Hearing, the ALJ specifically provided plaintiff's attorney with an opportunity to offer additional evidence before the record was closed. (T. 43).  Plaintiff's counsel never provided records or any evidence from either physician.[8]

Upon remand, the ALJ should contact Dr. Zogby and obtain an opinion regarding

---

[8]   The Court notes that defendant claims that Dr. Holsapple is an associate of Dr. Montgomery's at Neurosurgical Associates (T. 244) and that Dr. Yonemura is associated with the Pain Treatment Center and evidence from these providers is contained in the record.

plaintiff's functional limitations during the insured period.  Further, upon remand, the ALJ is directed to develop the record to ascertain the proper amount of weight to accord Dr. Zogby's opinions under 20 C.F.R. § 416.927(d).  *See O'Halloran v. Barnhart*, 328 F.Supp.2d 388, 394 (W.D.N.Y. 2004); *see also Donato v. Sec'y of Dep't of Health and Human Servs*., 721 F.2d 414, 419 (2d Cir. 1983) (holding that the ALJ has the duty to not only develop the proof but carefully weigh it).

## C.     Credibility

Plaintiff claims that the ALJ's credibility analysis is not supported by substantial evidence and did not comply with the factors set forth in 20 CFR § 404.1529(c)(3). (Dkt. No. 16, p. 26). The Commissioner contends that given the totality of the medical and non-medical evidence, the ALJ reasonably concluded that plaintiff's subjective symptomatology was not entirely credible. (Dkt. No. 18, p. 16).

The ALJ retains discretion to assess the credibility of a claimant's testimony regarding disabling pain and "to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant."  *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979); *Snell*, 177 F.3d at 135 (holding that an ALJ is in a better position to decide credibility).  If plaintiff's testimony concerning the intensity, persistence or functional limitations associated with his impairments is not fully supported by clinical evidence, the ALJ must consider additional factors in order to assess that testimony, including: 1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms.  20 C.F.R. §§

404.1529(c)(3)(I)-(vi), 416.929(c)(3)(I)-(vi).  The issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of his symptoms are consistent with the objective medical and other evidence.  *See* SSR 96-7p, 1996 WL 374186, at *2 (SSA 1996).  One strong indication of credibility of an individual's statements is their consistency, both internally and with other information in the case record.  SSR 96-7p, 1996 WL 274186, at *5 (SSA 1996).

After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony.  *Martone v. Apfel*, 70 F.Supp.2d 145, 151 (N.D.N.Y. 1999); *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  An ALJ rejecting subjective testimony must do so explicitly and with specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence.  *Melchior v. Apfel*, 15 F.Supp.2d 215, 219 (N.D.N.Y. 1998) (quoting *Brandon v. Bowen*, 666 F.Supp 604, 608 (S.D.N.Y. 1987)) (citations omitted).

In this case, the ALJ determined:

> After considering the evidence of record, I find that the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

The ALJ further noted:

> The claimant's testimony as to the frequency and intensity of her symptoms after surgery are not supported by the medical evidence of record.  The claimant's testimony as to her activities of daily living prior to her date last insured was somewhat vague but she did

acknowledge doing some house work.  (T. 15).

Having reviewed the Administrative Transcript in its entirety, the Court finds that the ALJ applied the correct legal standard in assessing plaintiff's credibility.  The ALJ thoroughly discussed plaintiff's complaints of pain including the frequency and intensity of her symptoms. The ALJ also discussed plaintiff's daily activities, noting plaintiff could do some housework and discussed plaintiff's medications including anti-inflammatories and muscle relaxants. (T. 15). The ALJ acknowledged plaintiff's testimony regarding side effects from the medication but also noted that according to the medical records, the effects were short term and ceased with a change in medication.  (T. 15).  The ALJ also stated that Vicodin and Lodine "helped quite a bit" and that plaintiff attended physical therapy with "a good response". (T. 16).  During the hearing, the ALJ asked plaintiff about her personal care and when she was able to do things "independently" and she stated that she could not remember. (T. 35). Consequently, the Court finds that the ALJ properly assessed the factors enumerated in 20 C.F.R. § 404.1529(c)(3)(i)-(vi) and § 416.929(c)(3)(i)-(vi).

In this case, taken as a whole, the record supports the ALJ's determination that plaintiff's claims were not entirely credible.  The Court finds that the ALJ employed the proper legal standards in assessing the credibility of plaintiff's complaints of consistent and disabling pain. The ALJ adequately specified the reasons for discrediting plaintiff's statements.  Accordingly, the ALJ's analysis of the record and decision as to plaintiff's credibility was based on substantial evidence.

**D.      RFC**

Residual functional capacity is:

20

> "what an individual can still do despite his or her limitations . . . . Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96-8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996)).  In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis.  20 C.F.R. § 404.1545(a).

As discussed, the ALJ failed to adequately develop the medical record in relation to plaintiff's treating physician, Dr. Zogby.  Consequently, the Court finds that the RFC assessment is not supported by substantial evidence.  Remand is appropriate in instances, such as this, when the reviewing court is "unable to fathom the ALJ's rationale in relation to the evidence in the record" without "further findings or clearer explanation for the decision."  *Williams v. Callahan*, 30 F.Supp.2d 588, 594 (E.D.N.Y. 1998) (citing *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).

**E.      Vocational Expert and the Medical-Vocational Guidelines.**

Plaintiff next argues that the ALJ erred in failing to elicit vocational expert testimony in this case, and instead relying exclusively on the Medical-Vocational Guidelines, or "grids." (Dkt. No. 16, p. 25).  Plaintiff claims that the full range of light work encompasses the ability to perform sedentary work and because the ALJ found plaintiff incapable of performing her past sedentary work, he should have consulted an expert to determine the extent of the erosion of the work bases.

Ordinarily, the Commissioner can meet his burden in connection with the fifth step of the relevant disability test by utilizing the grids. *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir.1999); *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir.1986). The grids take into consideration a claimant's RFC, as well as his or her age, education and work experience, in order to determine whether he or she can engage in substantial gainful work in the national economy. *Rosa*, 168 F.3d at 78. Whether or not the grids should be applied in order to make a step five determination presents a case-specific inquiry which depends on the particular circumstances involved. *Bapp*, 802 F.2d at 605. If a plaintiff's situation fits well within a particular classification, then resort to the grids is appropriate. *Id*. If, on the other hand, nonexertional impairments, including pain, significantly limit the range of work permitted by exertional limitations, then use of the grids is inappropriate, in which case further evidence and/or testimony is required. *Rosa*, 168 F.3d at 78; *Bapp*, 802 F.2d at 605-06. In such cases, the ALJ may rely on the grids only as a framework for decision-making. 20 C.F.R. § 416.969a(d). Nonexertional limitations include postural limitations such as limitations in climbing, reaching, stooping, crawling, balancing, and kneeling. *Id*. § 416.969a(c). As one court has explained,  [a] nonexertional limitation is one imposed by the claimant's impairments that affect [his or] her ability to meet the requirements of jobs other than strength demands, and includes manipulative impairments and pain.  *Sobolewski v. Apfel*, 985 F.Supp. 300, 310 (E.D.N.Y.1997) (citing 20 C.F.R. § 404.1569(a), (c)).

As discussed, the ALJ failed to properly assess the RFC, thus the findings made at the fifth step of the sequential analysis are affected.  The Court has already determined that remand is necessary for further proceedings with respect to plaintiff's functional limitations and proper application of the treating physician rule. On remand, an analysis may require the testimony of a

vocational expert regarding the effect that any nonexertional impairments may have on the plaintiff's ability to perform basic work activities. *See Pronti v. Barnhart*, 339 F.Supp.2d 480, 487 (W.D.N.Y. 2004).

**IV.     CONCLUSION**

For the foregoing reasons, it is hereby

**ORDERED** that the decision denying disability benefits be **REVERSED** and this matter be **REMANDED** to the Commissioner, pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with the above; and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been **RESCINDED**, as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit; and it is further

**ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

**Dated: September 30, 2010**
        **Syracuse, New York**

Norman A. Mordue
Chief United States District Court Judge